# EXHIBIT 1

*31 Wake Forest L. Rev. 183,* *

Copyright (c) 1996 Wake Forest Law Review Association, Inc.
Wake Forest Law Review

SPRING, 1996

31 Wake Forest L. Rev. 183

**LENGTH:** 13362 words

ARTICLES: SECURITIES ARBITRATION--A SUCCESS STORY: WHAT DOES THE FUTURE HOLD?

**NAME:** Deborah Masucci *

**BIO:**

* Manhattanville College, B.A., New York Law School, J.D., Vice President, Dispute Resolution for the National Association of Securities Dealers, Inc. Ms. Masucci has been director of the Arbitration Department of the NASD and a member of the Securities Industry Conference on Arbitration since 1983.

Special thanks to Allison Johnsen, a legal assistant for the National Association of Securities Dealers, Inc. and a third-year law student at Brooklyn Law School, for her assistance in the preparation of this article.

**SUMMARY:**
 ... Effective May 10, 1989, arbitration awards issued at SROs became subject to minimum content criteria expanding the decision to be more descriptive of the dispute. ...

**TEXT:**
Ms. Masucci explores the history of arbitration and makes predictions about its future within the context of National Association of Securities Dealers (NASD) procedures. She reviews dispute resolution in the securities industry, concentrating on the adoption of the NASD Code of Arbitration Procedure and its objectives and the effect of recent U.S. Supreme Court decisions on securities arbitration. Ms. Masucci describes the major benefits of industry-sponsored arbitration, emphasizing public availability of arbitrator decisions, the regulatory framework, heightened efficiency, and lower costs associated with the process.


INTRODUCTION


Dispute resolution in the securities industry has been the subject of numerous newspaper and other published articles during the last seven years for a number of reasons. One of the foremost reasons for this attention is the significant number of cases decided by the United States Supreme Court since 1985 that touch upon the arbitration of disputes in the securities industry. [1] These have been major cases which have impacted and developed arbitration law. Despite media criticism of the dispute resolution process, specifically allegations of a pro-industry bias at forums sponsored by self-regulatory organizations (SROs), the process and its performance have been largely successful. This success is measured not only by the number of cases resolved through the dispute resolution process, most of which receive little notice, but also by the flexibility of the process in the development of its rules and procedures to meet the changing landscape.

Today, the process continues to be the subject of heightened scrutiny. Recent criticisms concern the increased litigiousness of the process which may move it away from its original position as a fair, expedient,

[*184] and inexpensive mechanism to resolve disputes. The increased litigiousness is a result of a breakdown in the discovery process, a resort to the judicial process to stay stale claims, thereby increasing collateral litigation before arbitrators have an opportunity to review the case, and a fear of runaway punitive damage awards without a right of appeal. Others question the appropriateness of arbitration to decide employment discrimination cases, [2] and question the practices of nonattorneys who represent parties in arbitration. [3] In 1994, with this as a backdrop, the NASD [4] established the Arbitration Policy Task Force to review the objectives, performance, and future direction of dispute resolution in the securities industry. [5] This group will deliver its recommendations to the NASD Board of Governors in January 1996. [6] In November and December of 1994, the New York Stock Exchange (NYSE) sponsored the Symposium on Arbitration in the Securities Industry. [7] The symposium prompted a dialogue on the issues facing arbitration today. The NYSE is examining the recommendations offered during this symposium and the comment period thereafter to determine what actions should be taken. These two initiatives will result in changes in the role of dispute resolution in the securities industry and further enhance its effectiveness.

Throughout this period of evolution, the success of the process of dispute resolution has been overlooked. This success is the focus of this three-part article. Part one reviews the history and evolution of dispute resolution in the securities industry. Part two identifies the benefits and strengths of the process. Part three discusses the NASD move toward mediation.

I. THE HISTORY

This section provides a historical perspective on the genesis of dispute resolution in the securities industry and how case law has pushed this area into the forefront. It ends with statistical highlights and a discussion of two studies regarding the fairness of arbitration administered by SROs.
[*185]

A. Why Arbitration?

Arbitration at the NYSE was first offered in 1872. [8] The NASD adopted its Code of Arbitration Procedure (NASD Code) in 1968. [9] The objective of the NASD Code was to provide the small investor with a fast, fair, and inexpensive mechanism to resolve disputes with the securities industry. This was particularly important in 1968 because there had been a substantial increase in the number of small investors in the marketplace in previous years. Small investors oftentimes were unsophisticated and unfamiliar with the process of investing. Since many of their claims were small and not economically feasible to pursue in court, arbitration became a viable recourse.

Under the original provisions of the NASD Code, neither members nor associated persons were required to submit claims to arbitration. Participation by members and associated persons in an arbitration case brought by a customer was strictly voluntary. [10] This changed in 1972 with the adoption of rules requiring members and associated persons to submit to arbitration at the demand of a customer. [11]

Through the 1970s and 1980s, the business community, including the securities industry, began to utilize predispute arbitration agreements as a means to contain litigation costs and reduce exposure. The business community's concerns regarding the ability of juries to decide

complex lawsuits arose in the late 1980s. [12] The experiences of lawyers and the judiciary led to the conclusion that the civil justice system is slow, costly to the litigant, and unfair, thus increasing interest in dispute resolution methods. [13]

Judicial hostility towards arbitration limited the enforcement of the predispute arbitration agreements. [14] This changed in 1987 when the Supreme Court decided that claims under the Securities and Exchange Act of 1934 [15] and statutory claims pursuant to the Racketeer Influenced and Corrupt Organization Act [16] were deemed to be arbitrable in Shearson/ American Express, Inc. v. McMahon pursuant to a predispute arbitration
   [*186] agreement. [17] In deciding McMahon, the Supreme Court found that arbitration administered by SROs adequately protects the rights of investors because of safeguards resulting from oversight by the Securities and Exchange Commission (SEC). [18] Furthermore, the Court found that parties have the same remedies available in arbitration as they have in court. [19] Judicial support of arbitration continued through the 1980s and into the 1990s in both the customer and employee areas. In 1989, the Supreme Court decided Rodriguez de Quijas v. Shearson/American Express, Inc., [20] supporting the arbitrability of claims under the Securities Exchange Act of 1933. [21]

The enforcement of arbitration clauses in the employment arena received similar treatment by the Court. In 1987, in Perry v. Thomas, [22] the United States Supreme Court held that the Federal Arbitration Act [23] required a former employee of a securities firm to arbitrate his statutory wage claim against his former employer pursuant to an arbitration clause in Form U-4. [24] This was followed in 1991 by Gilmer v. Interstate/Johnson Lane Corp., [25] which held that claims brought under the Age Discrimination in Employment Act of 1967 [26] are arbitrable pursuant to the arbitration agreement in Form U-4. [27]


B. Securities Industry Conference on Arbitration


In 1977, the Securities Industry Conference on Arbitration (SICA) was created in response to an initiative by the SEC to institute a uniform process for the resolution of small claims by investors. [28] SICA is composed of the Securities Industry Association, public members, and ten SROs that sponsor arbitration programs. The initial formation of SICA included three public members. [29] Today, there are four. [30]

SICA's initial task was to develop a small claims arbitration process
   [*187] as a model to be adopted by the participating SROs. The project focused on claims under $ 2,500. [31] Subsequently, SICA developed the Uniform Code of Arbitration (Uniform Code) to be utilized for the resolution of all claims involving customers regardless of size. [32] The Uniform Code has been supplemented by two booklets intended to inform the investing public and arbitrators regarding the arbitration process, the Arbitration Procedures booklet and The Arbitrator's Manual. [33] The Uniform Code has been adopted by all participating SROs with minor variations. [34]

During the aftermath of McMahon, SICA cooperated with the SEC to change the rules to address fairness concerns resulting from the enforcement of arbitration agreements. [35] These concerns arose because of the relationship between the securities industry and the SROs which some believed created an appearance of unfairness to investors. Significant changes to the arbitration rules were adopted to address this perception, [36] including heightened arbitrator disclosure requirements, [37] enhanced discovery, [38] and public availability of securities arbitration awards. [39]

In 1990, SICA retained the services of Coopers & Lybrand to study the viability of a single arbitration forum as an alternative to the ten SROs which exist today. [40] It was believed that a single forum removed from SRO administration would eliminate the perception of

unfairness, improve efficiency of the process, and promote uniformity of the application of rules. [41] A final report was delivered in June 1991 and determined that there was no economic advantage to having a single forum. [42] As a result, SICA decided not to recommend the establishment of such a system. [43] SICA participants agreed to examine ways to pool resources and
 [*188]  arbitrators in lieu of the establishment of a single forum. [44]

Today, SICA meets regularly to monitor the Uniform Code and arbitration procedures and recommends changes intended to enhance the fairness and efficiency of the process. [45] Staff from the SEC, North American State Securities Administrators Associations, Commodities and Futures Trade Association, and American Arbitration Association (AAA) are invited to attend each meeting and participate in discussions. [46]


C. What Do the Numbers Show?


The 1994 Annual Report of the NASD reported that the annual share volume of trading on the NASDAQ Stock Market was 74.4 billion. [47] That same year, there were 5,570 new arbitration claims filed to be decided according to the NASD Code. [48] Claims filed pursuant to the NASD Code do not limit eligibility to transactions regulated by the NASD. [49] All that is required to submit a claim to arbitration at the NASD is that the dispute arise out of or in connection with the business of a member. [50] Many members of the NASD concurrently are members of other SROs. Consolidating the trading volume of the NYSE with that of the NASDAQ stock market demonstrates that the percentage of cases in which disputes arise is small. In other words, most trading occurs without any problems.

With this as a backdrop, it must be acknowledged that there has been a significant increase in the number of arbitration claims filed pursuant to SRO arbitration rules. The Eighth Report of SICA provides a cumulative report of claims filed at the ten participating SROs from 1980 to 1993. [51] The majority of all claims have been filed at the NASD and the NYSE. In 1994, the NASD received eighty-five percent of all new case filings and the NYSE received ten percent of all new case filings. [52]

What is significant about these numbers is not only the volume of cases decided, but the relative speed with which the cases are concluded. This is demonstrated by the NASD figures. During 1994, the NASD closed 4,561 cases. [53] The average length of time it took a case to close in 1994 was 10.4 months with the average hearing lasting 2.5 days. [54] These
 [*189]  are remarkable figures when compared to the time for resolution in crowded court dockets nationwide.

These numbers are important since they demonstrate the relative efficiency of the process, despite changes in the number and complexity of cases filed. However, this is only part of the story. One of the cornerstones of arbitration is fairness. While persons can disagree with the results of particular cases, it is the fairness of the process that becomes the measure of success. In May 1992, the General Accounting Office (GAO) reported on a study of securities arbitration entitled "How Investors Fare." [55] The study was commissioned at the request of the Chairman of the House Committee on Energy and Commerce and its Subcommittee on Telecommunications and Finance, along with the Chairman and four members of the Senate Committee on Banking, Housing, and Urban Affairs. [56] They requested that the GAO analyze the results of securities arbitration at industry-sponsored forums and compare these results with those of the AAA--the primary independent forum for securites arbitration, commodities arbitration, and litigation. [57] One of the conclusions of the study was that case results did not differ based on the choice of arbitration forum. [58] The GAO was unable to use its analysis in a comparison of litigated cases because there are few litigated cases involving individual investors' disputes, there are inherent differences between arbitration and litigation, and

there is little information available on the outcome of litigated cases since most of those cases settled out of court. [59] While the GAO did issue a number of recommendations intended to improve parties' confidence in the decision makers or arbitrators, the study concluded that there was no evidence of pro-industry bias at forums sponsored by SROs. [60]

In 1994, the GAO concluded a second study on securities arbitration. [61] This study was directed toward the arbitration of employment discrimination cases under SRO arbitration rules. [62] Although the number of discrimination cases decided was small in number, the GAO again did not find the results in cases to be unfair. [63] As in the 1992 study, the GAO identified initiatives that were directed towards improving confidence in the decision makers or arbitrators. [64]

[*190]

## II. THE PROCESS WORKS

This section describes what appear to be the major benefits of industry sponsored arbitration. This is not an exhaustive list, but identifies most of the major benefits. These benefits include the public availability of arbitrator decisions, the regulatory framework, and the administrative cost of the process to participants including the benefits of the expedited process for the resolution of small claims. The section concludes with a discussion of the decisionmakers and efforts made to enhance the quality and competency of arbitrators.

### A. The Decision

Prior to 1989, decisions rendered by arbitrators in the securities industry were treated no differently than most commercial arbitration decisions. They were private and confidential. On occasion, an article appeared reporting a significant or interesting decision released by a party. Most decisions were a sketchy disposition of all claims in an abbreviated, cursory fashion. Arbitrators rarely provided a reasoned decision.

This all changed in 1989. Effective May 10, 1989, arbitration awards issued at SROs became subject to minimum content criteria expanding the decision to be more descriptive of the dispute. [65] Arbitrators were encouraged but not required to describe the reasons for the decision. In addition, the results became publicly available pursuant to the policies of the sponsoring SRO. [66] In approving the rules effectuating the change, the SEC believed that the public availability of arbitrator decisions would promote investor confidence in the arbitration system. [67] The new process would also render this information available to a wider distribution of persons because of the perception that industry participants who frequently acted as parties in the process maintained an unfair advantage over the infrequent investors who could not ascertain how arbitrators decided cases similar to theirs because of the lack of information available through public sources. [68]

Pursuant to section 41 of the NASD Code, NASD arbitration awards must contain:

the names of the parties, the name(s) of counsel, if any, a summary of the issues, including the type(s) of any security or product in controversy, the damages and other relief requested, the damages and other relief awarded, a statement of any other issues resolved, the names of the arbitrators, the date the claim was filed and the award rendered, the number and date(s) of hearing sessions, the location of the hearings, and the signatures of the arbitrators concurring in the award. [69]

[*191]  Since 1989, section 41 of the NASD Code has been amended several times to increase the amount and type of information required to be contained in the award. When the rule was first approved, the NASD limited public availability to awards involving public customers. Arbitrators' names were redacted from the award in the belief that arbitrators who were primarily volunteers, would refuse to participate if cases in which they participated were publicly criticized. [70] After several years of experience, it was determined that this factor did not substantially impact the willingness of individuals to participate as arbitrators. [71] In 1991, all awards, including intra-industry awards, became publicly available in their entirety. [72] Awards issued publicly prior to the new rule change were amended to add back the names of the arbitrators. [73]

The objectives stated in the 1989 order effectuating this philosophical change have been achieved. Arbitration awards issued by SROs are widely available. Arbitrators are more frequently explaining the underlying reasons for decisions. The Securities Arbitration Award Reporter compiles the publicly available awards from all SROs and periodically analyzes outcomes and trends. [74] Several other services, such as WESTLAW, obtain copies of awards from SROs and then disseminate them widely.

This step by the securities industry has impacted rules for the securities industry offered by the AAA. In 1994, the AAA entered into an exclusive agreement with the Securities Arbitration Commentator to act as the vehicle for public availability of awards pursuant to the AAA Securities Arbitration Rules. [75] The number of AAA decisions currently available is small; however, in time these will become a significant source for comparison of decisions rendered pursuant to SRO rules.

B. Mandatory for Members

NASD rules contain provisions to enforce compliance with the arbitration rules, including honoring arbitration awards. [76] Special provisions of the arbitration rules permit arbitrators to initiate disciplinary referrals in cases where evidence is brought to the attention of a panel that NASD rules have been violated. [77] These initiatives enhance confidence in the process.

As previously noted, members and persons associated with members are required to submit to arbitration at the demand of a customer, an [*192] other member, or a person associated with a member. [78] This requirement to arbitrate does not cease if the member or associated person resigns or otherwise ceases its registration. [79] Much has been made about the philosophy of binding customers or employees to arbitrate pursuant to predispute arbitration agreements, but the member's requirement to submit to arbitration pursuant to NASD rules without a separate predispute arbitration agreement is a powerful mechanism to help investors and employees to resolve disputes arising out of the business of a member inexpensively, quickly, and fairly. Failure of a member to submit to arbitration in accordance with these rules will subject a member to disciplinary action by the NASD.

In addition to a member's requirement to submit to arbitration, [80] failure to honor an award rendered pursuant to the provisions of the Uniform Code or the securities rules of the AAA may be deemed conduct inconsistent with just and equitable principles of trade and a violation of Article III, section 1 of the NASD Rules of Fair Practice. [81] The applicability of this section extends to the failure of a member to comply with a panel's order or failure to appear at a hearing upon notice. [82]

In December 1992, provisions were adopted to permit the summary suspension of a member who has failed to honor an arbitration award rendered pursuant to the NASD Code. [83] These

provisions have circumvented attempts to retry an arbitration claim during a disciplinary hearing conducted for the purpose of determining whether disciplinary action should be taken for failure to honor the underlying award.

In 1995, another step was taken to bolster confidence in the arbitration process and to promote compliance by members with executed settlement agreements. [84] Although the NASD did not observe problems with members refusing to comply with settlement agreements, it took this step in conjunction with the adoption of NASD Mediation Rules and Procedures. [85] With the adoption of these rules, it was deemed prudent to clearly extend the requirements to honor arbitration awards to include executed settlement agreements. [86]

Finally, section 5 of the NASD Code provides, in part, a mechanism for arbitrators to initiate a disciplinary referral if the record of a proceed **[*193]** ing discloses information that NASD rules may have been violated. [87] This adds a policing mechanism to the NASD regulatory framework that is not available outside of SRO arbitration.

## C. The Cost of Arbitration

Costs to the parties fall into three categories: forum costs, expenses for the appearance of witnesses or production of documents, and attorneys' fees. Forum costs are quite low when compared to civil litigation or fees charged by arbitration fora not sponsored by SROs. Most other costs are impacted by the litigiousness of the case or choices by the parties to use expert witnesses.

In the 1992 GAO study, forum costs to the investor for initiating an arbitration were analyzed. [88] A person who considers filing an arbitration at the NASD should obtain a copy of the fee schedule as well as all applicable rules before proceeding. Section 43 of the NASD Code sets forth the schedule of fees applicable to customer disputes. [89] The filing of a claim must be accompanied by a fee based on the amount in controversy or a request for a waiver of fees based on financial hardship. [90] The fees are broken down into two parts. First, there is a nonrefundable filing fee required for the administration of the case. [91] This fee ranges from $ 15 for claims of $ 1,000 or less to a high of $ 300 for claims over $ 5 million. [92] Second, an additional hearing session deposit is required. [93] A hearing session is defined as any meeting between the parties and the arbitrators which lasts four hours or less including a prehearing conference. [94] Additional hearing session fees may be assessed in the arbitrators' final decision for multiple hearing sessions. [95] The arbitrators determine which party is assessed these fees. [96]

While additional fees may be assessed for postponements, [97] under the NASD rules the parties do not pay arbitrator fees, conference room fees, or other forum-related fees. Other costs and expenses associated with the process, including the cost of producing a witness or documents, may be reimbursed at the discretion of the arbitrator. [98] Parties should request that the arbitrators consider this issue.

There has been substantial debate regarding the authority of arbitrators to award attorneys' fees. The Arbitrator's Manual recommends that the arbitrators hear the arguments of the parties regarding the authority **[*194]** to award attorneys' fees. [99] The award of attorneys' fees in arbitration has recently become an issue of debate because more parties are being represented by counsel. The early experience of arbitration was that parties rarely were represented by an attorney. Today representation by counsel is a common occurrence. Generally arbitrators follow the American rule where all parties bear their own costs and expenses including attorneys' fees unless there is a contractual or statutory provision supporting such an award. [100] Here again, the GAO study has been a valuable resource for analyzing circumstances where attorneys' fees

are awarded. [101]

In viewing this section against the anecdotal experience of parties, one should consider the statistics discussed previously regarding the relative speed with which cases are resolved and the average number of hearing sessions that are required to resolve cases that are decided by arbitrators. [102] In 1994, the average hearing time required for cases was 2.5 days or 5 sessions and the average case closed in 10.4 months. [103] This relative speed contains costs to the parties which can be shifted at the discretion of the arbitrators. [104]

Finally, an area which receives little attention is claims under $ 10,000. For such claims, there is a simplified process which permits the customer to determine whether the case is to be decided upon the submissions of the parties or by a hearing. [105] In 1994, cases resolved without a hearing were concluded, on average, in four months. [106] The forum fees in these cases are capped at $ 150 and could be recovered at the discretion of the arbitrator. [107]

## D. The Arbitrators

Key to the effective resolution of disputes is the quality and competency of the decision maker or arbitrator. The NASD has been mindful of this and has established initiatives to broaden the number and diversity of arbitrators in order to increase the perception of fairness, and to enhance the quality and competency of arbitrators. [108]
[*195]

### 1. Who are the arbitrators?

Arbitrators are not employees of the NASD or other SROs. The first arbitrators were an elite group of insiders who were invited to participate. Most were securities professionals and attorneys whose major clientele were drawn from the securities industry. [109] Today, arbitrators come from many diverse non-industry groups as well as industry groups. These include organizations such as the American Association of Individual Investors, Institutional Investors, Inc., the American Bar Association as well as local bar associations and local business groups. [110] The NASD also cooperates with other arbitration fora such as the AAA and the Society of Maritime Arbitrators, Inc. to broaden its pool of arbitrators. [111] Arbitrators' qualifications, impartiality and competency have been scrutinized by parties and oversight organizations. The amount of information provided to the parties about the arbitrators, as well as disclosures pursuant to the NASD Code, [112] are initiatives used to raise the confidence level of the public regarding the ability of the arbitrators to decide cases fairly and competently.

SRO arbitrators, and arbitrators in general, are far better educated and qualified to deal with complex securities cases than a typical jury. The use of experienced arbitrators reduces expenses for expert witnesses and eliminates simplistic testimony that is needed with a lay jury in a typical trial.

### 2. Qualifications to become an arbitrator

Not everyone is qualified to become an arbitrator. Although the overall goal is to attract persons with the broadest range of experience possible, there are criteria which must be met before an individual can qualify to become an arbitrator. All applicants are required to demonstrate five to eight years of business, professional or other practical experience. [113] Applications must be accompanied by two letters of recommendation describing the

circumstances under which the writer has known the applicant, a description of the applicant's experience that qualifies him/her to be an arbitrator and an attestation to the applicant's character and fitness. [114] The applicant must complete an arbitrator profile detailing his/ her experience and background, including a certification that they are not subject to significant civil action or regulatory discipline. Finally, prior to selection on a particular case all arbitrators must attend a mandatory training program. [115]
[*196]

3. Classification of arbitrators

NASD arbitrators are classified as public arbitrators or securities industry arbitrators. This distinction has been made to balance the need to retain subject matter expertise by including an industry arbitrator with the countervailing need to enhance appearance of fairness by providing arbitrators who do not have significant ties with the securities industry. When the controversy involves public customers or employment disputes involving public policy issues such as discrimination claims, a majority of the panel is selected from the public arbitrators on the roster. [116] In 1989, the NASD amended its guidelines to clarify who may qualify as a public arbitrator because of SEC concerns that arbitration panels should include persons who are not so connected with the industry that it may hinder their ability to make independent judgments on specific industry practices.

Section 19 of the NASD Code defines an industry arbitrator as a person who is associated with a member or other broker-dealer, government securities broker-dealer, municipal securities dealer, or who has been associated with one of these organizations within the past three years. [117] An individual may be reclassified as a public arbitrator three years after he or she no longer works for a member if the new employment is not related to the industry. [118] Industry retirees may not serve as public arbitrators no matter how long they are retired. [119]

Section 19 also prohibits individuals who have close ties with the industry from being classified as public arbitrators. [120] This section excludes from the public arbitrator rolls attorneys, accountants, and other professionals who have attributed twenty percent or more of their individual professional work effort to the securities industry within the previous two years. [121] Section 19 additionally prohibits spouses or household members of those associated with a registered broker-dealer, municipal securities dealer, or government securities dealer from serving as public or industry arbitrators. [122]

4. Disclosures required of arbitrators and arbitrator selection

All arbitrators must submit biographical information on an arbitrator profile form to the NASD. [123] The arbitrator profile includes educational background, the arbitrator's former employers, and a description of any conflicts of interest. [124] Conflicts of interest that must be described involve: clients, broker-dealers where the arbitrator has an account, broker [*197] age firms against whom the arbitrator may have brought a proceeding, and brokerage firms in a proceeding where the arbitrator was an expert witness. [125]

In selecting arbitrators for cases, the NASD staff eliminates those who may have conflicts with parties, counsel, or witnesses, taking into consideration the background and expertise of the arbitrator. Each prospective arbitrator is provided with information regarding the case, including the names of parties, their lawyers and potential witnesses, and the nature of the case. [126] The arbitrator determines if any conflicts exist which would preclude the rendering of a fair and impartial decision. [127] All arbitrators in securities controversies must qualify as impartial, neutral arbitrators. Section 23 of the NASD Code requires that arbitrators disclose any interests or relationships that are likely to compromise their impartiality. [128] The

obligation to disclose conflicts is a continuing obligation and includes any information that may surface during the pendency of the hearing itself. [129]

The parties receive the name and current business affiliations of each arbitrator, at least ten years business or professional background, and any disclosure that did not disqualify the arbitrator from appointment. [130] Since 1993, the parties have been provided with a descriptive paragraph explaining the arbitrator's background. [131] The parties may request additional information regarding the arbitrators. [132] Although the rules require that this information be provided eight business days before the hearing, [133] the NASD regularly provides this biographical information thirty to sixty days prior to the hearing. This allows the parties sufficient time to investigate the background of the arbitrators and their suitability to preside. The parties may raise unlimited challenges for cause to an arbitrator and at least one peremptory challenge. [134] NASD experience indicates that the parties are very active in the process of examining the qualifications of arbitrators and the acceptance of the arbitrators to serve. The parties can obtain copies of all awards previously rendered by the arbitrators. Parties frequently use the information contained in the award to determine the acceptability of the arbitrator. Through this process of challenging, the NASD recommends an average of five arbitrators per case. The typical panel requires three arbitrators.

This process of arbitrator selection is different from that employed
 [*198] by the AAA. [135] Under AAA rules, the parties are provided with lists of arbitrators, and then strike off unsuitable arbitrators. [136] Final appointment is determined after several lists are exchanged. [137] A split of opinion exists over which process is preferable. In fact, many believe the AAA process provides the parties with a greater level of participation in selecting arbitrators. The NASD pilot rules on large and complex cases adopts the AAA list selection process. [138] In this pilot stage, the NASD will compare the satisfaction of the parties with this alternative selection process. Regardless of whether the NASD adopts the list selection utilized by the AAA, current experience of the NASD indicates that parties are actively involved in the selection of arbitrators to cases even under the regular NASD selection process.


5. Arbitrator evaluation


A system of evaluation to assess arbitrator quality and competency as well as to identify areas for improvement in the rules and arbitrator education is an important aspect of increasing confidence in arbitrators. The NASD solicits parties' views on each case with a standard form. [139]

In April 1989, the Committee on Qualifications of the Society of Professionals in Dispute Resolution (SPIDR) issued a report regarding competence criteria for neutrals. [140] This SPIDR study was undertaken to determine "how best to promote competence and quality in the practice of dispute resolution." [141] The report indicated that it "found no evidence that formal academic degrees . . . are necessary to the competent performance as a neutral." [142] The NASD experience "parallels the findings in the study that neither formal academic degrees nor minimum business or professional experience can foretell who will be a competent arbitrator. Instead, qualifications based on performance are a more accurate measure of an arbitrator's competence." [143]

In 1992, SICA revised the evaluation form utilized by SROs to reflect performance criteria that was identified in the SPIDR report. In addition, the form modifications provided more space to permit parties or arbitrators to describe their experiences. If a respondent does not wish to have the form provided to the arbitrator, a box on the form indicates this option is available. [144]

In addition to the evaluation form utilized by NASD, NASD has in [*199] stituted a hotline to encourage parties and arbitrators to call in and leave comments on the voicemail system. The information received from the hotline is provided to the staff for any required action. [145]

## 6. Arbitrator training

Arbitrator education is growing in importance as a result of the increasing securities arbitration caseload and heightened complexity of issues facing arbitrators. [146] The NASD has sponsored arbitrator education in many forms since 1985. The NASD often invites arbitrators who are enrolled at other SROs to attend the programs that the NASD sponsors, and also advises arbitrators of the availability of programs offered by other SROs, the AAA, and other organizations. [147] In 1986, the NASD produced a training film for arbitrators entitled, "Agents of Fairness." [148] The film emphasized fairness and the perception of fairness in arbitration proceedings. The film was used at arbitrator education programs conducted throughout the United States through 1991. The NASD also offers national educational seminars to train arbitrators, many times in conjunction with NASD regulatory seminars. [149] In this way, arbitrators are instructed on both arbitration and compliance issues at the same time. The recent programs include workshops which enable the arbitrator to practice new skills. [150] In 1991, the NASD co-sponsored certain training sessions with the AAA and several SROs.

In addition, the NASD offers advanced training on emerging issues and specialized topics. [151] At these training sessions, which are usually held in cities where arbitrators have the highest caseloads, arbitrators are updated on recent trends by speakers who are experts in their fields. Such training sessions give arbitrators a chance to "share their experiences with colleagues in an informal setting." [152]

As a result of the 1992 GAO report, the NASD instituted a mandatory arbitrator training requirement effective January 1, 1993, for all new arbitrators and arbitrators who had not decided a case prior to January 1, 1993. [153] The number of available arbitrators shrunk from 7,000 to 2,400 because of this initiative. [154] In July 1993, the NASD Board of Governors approved an arbitrator training program that provided for training of 3,600 new arbitrators through 1994. [155] The Board also approved a program of specialized training for chairpersons. [156] Future train [*200] ing will continue to emphasize performance issues. Mandatory education is likely to be broadened to include a mandatory continuing education element.

## 7. Arbitrator recruitment

As noted above, the NASD has experienced a substantial decline in the number of arbitrators available to decide cases at a time when the number of incoming cases is increasing and the parties are actively involved in the arbitrator selection process by challenging arbitrators. [157] In 1995, the NASD embarked on an Arbitrator Recruitment Plan intended to increase the number, quality, and diversity of available arbitrators. [158] The goal is to add 3,000 new arbitrators during a two year period ending December 1996. [159]

In order to facilitate these recruitment efforts the NASD established Regional Arbitrator Recruitment Councils comprised of volunteers who will assist the NASD in identifying and recruiting new candidates. [160] In this way, the NASD will have access to the broadest cross-section of potential candidates.

## III. MEDIATION

Since 1989, the NASD has supported the use of mediation to achieve early settlement of disputes. The parties to a mediation benefit by reduced costs associated with early settlement and a more satisfying resolution of the dispute since the parties control the outcome. This is achieved by the mediator working with the parties to analyze the risks of proceeding to an arbitration hearing and facilitates settlement possibilities. In July 1989, the NASD embarked on a Pilot Mediation Program in conjunction with the AAA and U.S. Arbitration and Mediation, Inc. Participation was voluntary and did not result in a binding decision or delay the processing of the companion arbitration claim. The closeout time for arbitration cases settled by mediation in this pilot was nine months. [161]

In May 1991, the mediation pilot was expanded to include Judicate, an organization which uses solely former judges as mediators. Additionally, the NASD revised the pilot to obtain member firm consent before referring the case to a mediation partner and the NASD agreed to pay the customer's administrative fee for mediation. These efforts were intended to increase participation. Even with these enhancements, participation did not dramatically increase. During 1994, the NASD evaluated the performance of the pilots and the receptiveness of the parties to utilize mediation with a view towards the next step. It determined that the

 [*201]  NASD should develop its own mediation rules and procedures. These rules became effective August 1, 1995. [162]

The majority of the mediation cases expected to be filed under the new rules will come from the NASD arbitration docket. Mediation, in contrast to arbitration, is voluntary and non-binding. The NASD contacts parties involved in an arbitration case and introduces the mediation program by describing the potential benefits. The role of mediation and the potential benefits to the parties is described. As more parties become aware of the existence of mediation, it is expected to be requested more frequently. In those instances, the NASD will contact the other parties to seek agreement to mediate. Parties may also elect to bring cases directly into mediation without filing an arbitration case. The NASD accepts the case as long as the subject matter is appropriate for NASD arbitration.

For cases that are transferred from the arbitration docket, there is no delay in the arbitration process unless the parties agree otherwise. The mediation runs concurrently with the arbitration so that the parties will not lose any time on the arbitration track. It is believed that the mediation process will operate much faster so there will be minimal timing conflicts in most cases.

The model for the NASD program is the caucus-based format favoring a primarily facilitative style mediation. The mediators do not offer their own evaluation of the case, but instead help the parties work out their own solutions.

Parties pay an administrative fee of $ 150 each for cases involving public customers. [163] For intra-industry cases which involve only brokerage firms and registered representatives, each party is charged $ 250. [164] These fees will be waived in any case that is already on the NASD arbitration docket.

The parties in mediation are required to pay the mediator's fees and expenses, plus any charges for mediation facilities. These costs will be split equally by the parties unless they agree otherwise. [165] The mediator's fees are $ 150 per hour.

Because of the expedited nature of these proceedings, most mediations conclude in a single day. There is a cost savings to the parties in the vast majority of cases. This is true even without adding the savings of attorneys' fees, expert witness fees and reduction of down-time.

Currently, the number of mediators approved under the NASD program is small. Criteria to become a mediator is purposely stringent. In identifying potential mediators, the NASD first drew from its arbitrator pool since it was believed that numerous arbitrators also served significant roles as mediators in other forums. Candidates for mediator posi **[*202]** tions are not only required to qualify as NASD arbitrators, but also must provide demonstration of experience as a mediator through letters from parties whose cases they facilitated. Consideration also is given regarding previous training as a mediator. The focus for the NASD currently is to limit the number of mediators to control quality and deliver successful results.

The NASD is not the only forum that has developed a mediation program. Recently, the Philadelphia Stock Exchange joined with the AAA to provide the mediation option to parties arbitrating cases pursuant to the Philadelphia Stock Exchange rules. [166]

Other exchanges have either developed their own mediation rules or have partnered with mediation providers to offer this nonbinding process as an alternative to traditional arbitration. This movement will continue to ensure that parties are provided with alternatives to resolve disputes.


CONCLUSION


Arbitration has met the needs of thousands of investors by assisting in the resolution of their disputes with the securities industry. The NASD continually reviews its arbitration rules, procedures, and resources to enhance efficiency and improve confidence in the process. The arbitration process is geared towards a fast, inexpensive, and fair means of resolving these disputes.

The arbitration process in the securities industry has become the main forum for brokers and customers to resolve their disputes. Even though some constituents may consider the courts or traditional dispute resolution providers to be more neutral forums than SROs, the GAO found no indication of industry bias in their studies. [167] In fact, no study has shown any bias in results obtained through SRO arbitrations. The heightened attention that has been given to the process of arbitration in recent years aids in policing the effectiveness of the arbitration process and promotes changes to increase confidence. The process will continue to change to meet the needs of all who are impacted by it. The recommendations of the NASD Arbitration Policy Task Force will prepare the NASD to meet its future role in dispute resolution.

**Legal Topics:**

For related research and practice materials, see the following legal topics:
Civil Procedure > Alternative Dispute Resolution > Mandatory ADR
Securities Law > Self-Regulating Entities > National Association of Securities Dealers
Securities Law > Self-Regulating Entities > National Securities Exchanges > New York Stock Exchange


**FOOTNOTES:**


⫟n1 For a discussion of the significant Supreme Court decisions, see infra notes 15-27 and accompanying text.

⫟n2 See Riding Crop and Slurs: How Wall Street Dealt With a Sex-Bias Case, WALL ST. J., June 9, 1994, at A1.

n3 See Michael Siconolfi, Imperfect Advocate: Investors With Gripes Gripe About a Firm That Pleads Their Case, WALL ST. J., Nov. 14, 1995, at A1.

n4 The NASD is a self-regulatory organization established under the Maloney Act which provided for the establishment of national securities associations to supervise the over-the-counter securities market. NASD Manual (CCH) 1 101 (May 1993).

n5 See Former SEC Head to Chair NASD Task Force on Arbitration, Study Due December 1995, NASD Press Release, PR NEWSWIRE, at *1, Sept. 9, 1994, available in LEXIS, Nexis Library, Curnws File. See also Michael Siconolfi, Revised Rules Are Mapped for Securities Arbitration, WALL ST. J., Nov. 14, 1995, at C1.

n6 See Siconolfi, supra note 3, at A1.

n7 Constantine N. Katsoris, New York Stock Exchange, Inc. Symposium on Arbitration in the Securities Industry, 63 FORDHAM L. REV. 1501 (1995)[hereinafter NYSE Symposium].

n8 P. HOBLIN, SECURITIES ARBITRATION: PROCEDURES, STRATEGIES, CASES 1-2 (1988).

n9 Deborah Masucci & Robert S. Clemente, Securities Arbitration at the New York Stock Exchange, Inc. and National Association of Securities Dealers, Inc., in SECURITIES ARBITRATION 1995 at 291, 295 (PLI Corp. Law & Practice Course Handbook Series No. B899, 1995).

n10 See NATIONAL ASSOCIATION OF SECURITIES DEALERS, NASD NOTICE TO MEMBERS, July 23, 1971 (proposed amendments to By-Laws, Rules of Fair Practice and the Code of Arbitration Procedure)[hereinafter Amendments].

n11 Id.; NASD CODE OF ARBITRATION PROCEDURE sections 12 (1995) [hereinafter NASD CODE].

n12 See Steven Wermiel, Lawyers & Judges Term System of Civil Suits Unfair, Costly & Slow, WALL ST. J., Apr. 7, 1989, at 2.

n13 See Steve J. Adler, Can Juries Do Justice To Complex Suits, WALL ST. J., Dec. 21, 1989, at 2.

n14 See Wilko v. Swan, 346 U.S. 427, 435 (1953) (stating that "the right to select the judicial forum is the kind of provision that cannot be waived").

n15 15 U.S.C. sections 78 (1994).

n16 18 U.S.C. sections 1961-1968 (1994).

n17 482 U.S. 220, 234, 242 (1987).

n18 Id. at 233-34.

n19 Id. at 238, 240; Racketeer Influenced and Corrupt Organization Act, 18 U.S.C. sections 1961-1962 (1994).

n20 490 U.S. 477 (1989).

n21 Id. at 481.

ℸn22 482 U.S. 483 (1987).

ℸn23 9 U.S.C. sections 1 (1994).

ℸn24 Perry, 482 U.S. at 489. Form U-4, Uniform Application for Securities Industry Registration or Transfer. The U-4, signed by all registered persons, binds them to adhere to the rules and regulations of the SROs. It also contains an agreement to arbitrate disputes arising out of the registrant's employment pursuant to the SRO rules. Id.

ℸn25 500 U.S. 20 (1991).

ℸn26 29 U.S.C. sections 621 (1988).

ℸn27 Gilmer, 500 U.S. at 35.

ℸn28 See Constantine N. Katsoris, The Level Playing Field, 17 FORDHAM URB. L.J. 419, 427-28 (1989) (providing a comprehensive description of the creation of SICA and its objectives) [hereinafter Level Playing Field].

ℸn29 See also SECURITIES INDUSTRY CONFERENCE ON ARBITRATION, EIGHTH REPORT OF THE SECURITIES INDUSTRY CONFERENCE ON ARBITRATION (1994) [hereinafter EIGHTH REPORT]. Notice of Filing of Proposed Rule Change by National Association of Securities Dealers, Inc., Exchange Act Release No. 16,425, at *1, Dec. 14, 1979, available in LEXIS, Fedsec Library, Secrel File.

ℸn30 Self-Regulatory Organizations; Order Approving Proposed Rule Change by the Municipal Securities Rulemaking Board; Relating to the Arbitration Code and Arbitration Fees and Deposits, Exchange Act Release No. 29,721, at *1, Sept. 23, 1991, available in LEXIS, Fedsec Library, Secrel File.

ℸn31 Katsoris, Level Playing Field, supra note 28, at 428.

ℸn32 Id.

ℸn33 The updated versions of the Arbitration Procedures Booklet, the Arbitrator's Manual and the NASD Code are available through the NASD.

ℸn34 Id. at 428, 464.

ℸn35 Id. at 430.

ℸn36 Self-Regulatory Organizations; Order Approving Proposed Rule Changes by the New York Stock Exchange, Inc., National Association of Securities Dealers, Inc. and the American Stock Exchange, Inc. Relating to the Arbitration Process and the Use of Predispute Arbitration Clauses, Exchange Act Release No. 26,805, at *3-*4, May 10, 1989, available in LEXIS, Fedsec Library, Secrel File [hereinafter SEC Release No. 26,805].

ℸn37 Id. at *17-*19.

ℸn38 Id. at *27-*39.

ℸn39 Id. at *40-*51.

ℸn40 See EIGHTH REPORT, supra note 29, at 2.

ℸn41 Id.

n42 Id.

n43 Id.

n44 Id. at 4.

n45 Id.

n46 Id. at 1.

n47 See NATIONAL ASSOCIATION OF SECURITIES DEALERS, INC., 1994 ANNUAL REPORT 5 (1994) [hereinafter 1994 REPORT].

n48 Id. at 3.

n49 Id. Pursuant to sections 1 of the NASD Code, a matter is eligible for submission to arbitration if it arises out of, or in connection, with the business of any member of the NASD. NASD CODE, supra note 11, sections 1. The NASD Annual Report for 1994 reflects a membership of 5,426 member firms with 485,548 registered representatives. 1994 REPORT, supra note 47, at 3.

n50 NASD CODE, supra note 11, sections 1.

n51 See EIGHTH REPORT, supra note 29, at 25-29.

n52 MASUCCI AND CLEMENTE, supra note 9, at 299.

n53 Id.

n54 See Mastrobuono Decision, SECURITIES ARB. COMMENTATOR, March 1995, at 2.

n55 U. S. GEN. ACCOUNTING OFFICE, SECURITIES ARBITRATION: HOW INVESTORS FARE 1 (1992)[hereinafter GAO STUDY].

n56 Id. at 4.

n57 Id.

n58 Id. at 7, 35-38.

n59 Id. at 35.

n60 Id. at 60.

n61 See U.S. GEN. ACCOUNTING OFFICE, EMPLOYMENT DISCRIMINATION--HOW REGISTERED REPRESENTATIVES FARE IN DISCRIMINATION DISPUTES 94-17 (1994).

n62 Id. at 10.

n63 Id.

n64 Id. at 16.

n65 See SEC Release No. 26,805, supra note 36, at *40-*46.

n66 Id. at *40-*51.

n67 Id. at *46-*47.

n68 Id. at *47.

n69 NASD CODE, supra note 11, sections 41.

n70 Id.

n71 Id.

n72 Id.

n73 Id.

n74 For information, contact Richard P. Ryder, Securities Arbitration Commentator, P.O. Box 112, Maplewood, NJ 07040 or (201) 761-5880.

n75 See AAA Awards on SAC's Database, SEC. ARB. COMMENTATOR, July 1994, at 2.

n76 NASD CODE, supra note 11, sections 41.

n77 Id. sections 5.

n78 Id. sections 12(a).

n79 See O'Neel v. NASD, Inc., 667 F.2d 804, 807 (9th Cir. 1982) (obligation to arbitrate not extinguished by resignation from association of securities dealers).

n80 As used in this article, "member" includes an associated person.

n81 Order Granting Approval to Proposed Rule Change Relating to Improvements in the NASD Code of Arbitration Procedure, Exchange Act Release No. 29,166, at *2-*3, May 7, 1991, available in LEXIS, Fedsec Library, Secrel File.

n82 Id.

n83 NASD Certificate of Incorporation Bylaws, art. VI, sections 3 (1995).

n84 NATIONAL ASSOCIATION OF SECURITIES DEALERS, NASD NOTICE TO MEMBERS 95-76 (September 1995).

n85 Id.

n86 NASD CODE, supra note 11, sections 51.

n87 Id. sections 5.

n88 See GAO STUDY, supra note 55, at 45-46.

n89 See NASD CODE, supra note 11, sections 43(a).

n90 Id.

n91 Id.

n92 Id.

n93 Id.

n94 Id. sections 43(b).

n95 Id. sections 43(c).

n96 Id.

n97 Id. sections 30(b).

n98 Id. sections 43(c).

n99 Id.

n100 See N.Y. CIV. PRAC. L. & R. sections 7513.

n101 See GAO STUDY, supra note 55, at 47.

n102 See supra Part I.C (discussing statistics regarding the relative speed with which cases are resolved).

n103 For a discussion of the numbers of claims filed, see supra notes 52-53 and accompanying text.

n104 NASD CODE, supra note 11, sections 43(c).

n105 Id. sections 13.

n106 See supra Part I.C (discussing statistics regarding the relative with which cases are resolved).

n107 NASD CODE, supra note 11, sections 44 (1995).

n108 For a discussion of initiatives taken by NASD, see infra notes 110-12 and accompanying text.

n109 See Masucci & Clemente, supra note 9, at 352.

n110 Id.

n111 Id.

n112 See NASD CODE, supra note 11, sections 21, 23.

n113 See Masucci & Clemente, supra note 9, at 353.

n114 Id.

n115 Id.

n116 NASD CODE, supra note 11, sections 19(a).

n117 Id. sections 19(c).

n118 Id.

n119 Id.

n120 Id. sections 19(d).

n121 Id. sections 19(c).

n122 Id.

n123 Masucci & Clemente, supra note 9, at 359-65.

n124 Id.

n125 Id. at 361-62.

n126 Id. at 305-06.

n127 Id.

n128 NASD CODE, supra note 11, sections 23.

n129 Id. sections 23(c).

n130 Id. sections 21.

n131 See Masucci & Clemente, supra note 9, at 463-64 (providing an example of an arbitrator Disclosure Form).

n132 NASD CODE, supra note 11, sections 21.

n133 Id.

n134 Masucci & Clemente, supra note 9, at 315-17.

n135 See AM. ARBITRATION ASS'N, SECURITIES ARBITRATION RULES Rules 14-16 (1995).

n136 Id.

n137 Id.

n138 See NASD CODE, supra note 11, sections 46.

n139 Masucci & Clemente, supra note 9, at 329, 355.

n140 SOCIETY OF PROFESSIONALS IN DISPUTE RESOLUTION, QUALIFYING NEUTRALS: THE BASIC PRINCIPLES 5 (1989).

n141 Id. at 1.

n142 Id. at 3.

n143 See Masucci & Clemente, supra note 9, at 355.

n144 Id.

n145 Id. The telephone number is 1-800-925-0278.

n146 Id. at 356-57.

n147 Id. at 357.

n148 Id.

n149 Id.

n150 Id.

n151 Id.

n152 Id.

n153 Id. at 301.

n154 Id.

n155 Id.

n156 Id.

n157 For a discussion of challenges in the selection of arbitrators, see supra note 134 and accompanying text.

n158 Masucci & Clemente, supra note 9, at 317.

n159 Id.

n160 Id.

n161 Mediation--Another Alternative, SEC. ARB. COMMENTATOR, Aug. 1990, at 2.

n162 NATIONAL ASSOCIATION OF SECURITIES DEALERS, NASD NOTICE TO MEMBERS 95-62 (August 1995). For a further analysis of the mediation rules, see NASD CODE, supra note 11, sections 50-55.

n163 NASD CODE, supra note 11, sections 43(i).

n164 Id. sections 44(j).

n165 Id. sections 43(j), 44(j).

n166 AAA to Play Host for PHLX Mediation, COMPLIANCE REP., Oct. 30, 1995, at 9.

n167 For a discussion of the findings of the GAO Study, see supra notes 58-64 and accompanying text.

Service: **Get by LEXSEE®**
Citation: **31 Wake Forest l. rev. 183**
View: Full
Date/Time: Friday, January 11, 2008 - 7:07 PM EST



About LexisNexis  | Terms & Conditions  | Contact Us
Copyright ©  2008 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.